UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

|  |  |  |
|---|---|---|
|  |  | CIV. 07-4116 |
| POET PLANT MANAGEMENT, LLC, | : |  |
| f/k/a BROIN MANAGEMENT, LLC; POET |  |  |
| RESEARCH, INC., f/k/a BROIN AND | : |  |
| ASSOCIATES, INC.; and POET DESIGN |  |  |
| AND CONSTRUCTION, INC., f/k/a | : |  |
| BROIN RESEARCH, INC., |  | **BRIEF IN SUPPORT OF** |
|  | : | **MOTION FOR PRELIMINARY** |
| Plaintiffs, |  | **INJUNCTION AND REQUEST** |
|  | : | **FOR EXPEDITED HEARING** |
| vs. |  |  |
|  | : |  |
| ANTHONY A. SIMPSON, |  |  |
|  | : |  |
| Defendant. |  |  |

o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o-o

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs, Poet Plant

Management, LLC, f/k/a Broin Management, LLC; Poet Research, Inc., f/k/a Broin and

Associates, Inc.; and Poet Design and Construction, Inc., f/k/a Broin Research, Inc.

(hereinafter singularly or collectively "POET") have moved for a preliminary injunction

prohibiting Defendant Anthony A. Simpson ("Simpson") from working for Ethanex

Energy, Inc. ("Ethanex") and from disclosing and/or using POET's confidential

information and trade secrets.

## I.  FACTS

**A.      Procedural Background**

After this action was removed, POET filed an Amended Verified Complaint

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 2

("Am. Verified Complaint"), a Motion for Temporary Restraining Order, and Motion for Expedited Discovery on August 21, 2007.  POET has asked the Court for an expedited hearing on both motions, and they are currently pending before the Court.  On August 23, POET filed a Motion for Preliminary Injunction.  POET asks that the Court grant its Motion for Temporary Restraining Order and Motion for Expedited Discovery, and set a hearing on its application for a preliminary injunction after the expedited discovery has been completed and while the TRO is still in place.

**B.     POET**

POET Research, Inc., f/k/a Broin and Associates, Inc., is a South Dakota corporation with its principal place of business in Sioux Falls, South Dakota.  (Am. Verified Complaint ¶ 1.)  POET Research owns ethanol-production technology and licenses its technology to ethanol facilities that are constructed by POET Design and Construction and operated by POET Plant Management.  (*Id.*)  Poet Research's ethanol-production technology is proprietary, highly confidential, and extremely valuable.  (*Id.*)

POET Design and Construction, Inc., f/k/a Broin Research, Inc., is a South Dakota corporation with its principal place of business in Sioux Falls, South Dakota. (Am. Verified Complaint ¶ 2.)  POET Design and Construction designs, engineers, and constructs technologically-advanced ethanol-production facilities that convert corn to ethanol.  (*Id.*) POET Design and Construction has designed, engineered, and constructed more than 25 ethanol plants, all of which employ Poet Research's technology.  (*Id.*)

POET Plant Management, LLC, f/k/a Broin Management, LLC, is a Minnesota

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 3

limited liability company with its principal place of business in Sioux Falls, South

Dakota.  (Am. Verified Complaint ¶ 3.)  POET Plant Management operates and manages

20 ethanol plants, all of which were designed and constructed by POET Design and

Construction, Inc.  (*Id.*)  The company's management techniques and practices are

proprietary, highly confidential, and extremely successful.  (*Id.*)

Each of the ethanol plants constructed and operated by POET is owned by a

separate, independent entity.  (Am. Verified Complaint ¶ 4.)  The owner signs a licensing

agreement with POET Research to use its ethanol-production technology and a design-

build agreement with POET Design and Construction to design, engineer, and construct

the plant, using POET Research's licensed technology.  (*Id.*)  In conjunction with

signing the licensing and design-build agreements, the owner signs a management

agreement with POET Plant Management to operate the plant.  (*Id.*)  Pursuant to the

management agreement, POET Plant Management provides a General Manager to the

plant.  (*Id.*)  The General Manager is employed by POET Plant Management, reports to

supervisors in Sioux Falls, and is directed from Sioux Falls.  (*Id.*)  POET's technology,

business model, and organizational structure are unique within the ethanol industry.  (*Id.*)

**C.    Simpson**

Simpson began his employment with POET on November 6, 1998, when he was

hired as General Manager of POET's ethanol plant located near Albert Lea, Minnesota.

(Am. Verified Complaint ¶ 5.)   In March 2002, Simpson took over as the General

Manager of POET's ethanol plant located in Caro, Michigan.  (*Id.*)  Prior to being hired

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 4

by POET, Simpson had no experience in the ethanol industry.  (*Id.* ¶ 12, Ex. 4.)

As the General Manager of both the Albert Lea and Caro facilities, Simpson was the highest ranking POET employee at each respective facility.  (Am. Verified Complaint ¶ 13.)  His responsibilities included overseeing "all business operations, plant operations, purchasing operations, marketing operations, personnel operations, and any and all other items relating to plant operations and profitability."  (*Id.*, Ex. 5.)  He supervised all plant employees and reported regularly to POET management on sensitive information regarding plant finances and operations. (*Id.*)  As a General Manager, Simpson necessarily had intimate and extensive knowledge of POET's proprietary and confidential ethanol-production technology and management practices and techniques. (*Id.* ¶ 13.)

### 1.     Simpson's Contractual Obligations

When Simpson was hired as General Manager of the Albert Lea facility on November 6, 1998, he signed an employment agreement ("Albert Lea Employment Agreement").  (Am. Verified Complaint ¶ 9, Ex. 1.)   This agreement had a confidentiality clause which precluded Simpson from disclosing trade secrets and other confidential information to third parties.  (*Id.* Ex. 1 at § 5.2.)  The agreement also included a non-compete provision:

> The Employee shall not, during his or her employment with Employer and
> for a period of three (3) years after the termination of this Agreement,
> directly or indirectly, engage in the same or a similar business to that of the
> Employer within the United States of America.  Without limiting any other
> remedies available to the Employer to enforce this Article, the Employee

agrees that an injunction or other equitable relief shall be available without
the necessity of the Employer posting a bond.

(*Id*. Ex. 1 at § 5.3.)

When Simpson became the General Manager of POET's ethanol facility in Caro,
Michigan, he signed a second employment agreement ("Caro Employment Agreement").
(*Id*. ¶ 10. Ex. 2.)   As was the case with the Albert Lea Employment Agreement, this
agreement included a non-compete provision stating that he would not "during the term
of this Agreement and within a period of three years after leaving the employment of
Employer [POET], engage, directly or indirectly, in the same or a similar business to that
of the Employer within the United States of America."  (*Id*. Ex. 2 at § 4.3.)  The Caro
Employment Agreement also included a provision regarding confidential information
prohibiting Simpson from disclosing any of POET's confidential information to any third
party either for his own benefit or the benefit of others.  (*Id*. Ex. 2 at § 4.2.)  The Caro
Employment Agreement provides that "[t]he Employee further acknowledges that if
employment with the Employer terminates for any reason, the Employee can earn a
livelihood without violating the foregoing restrictions and that the Employee's ability to
earn a livelihood without violating these restrictions is a material employment
condition."  (*Id*. Ex. 2 at § 4.4.)  Significantly, the Employment Agreement specifically
provides that POET is entitled to seek injunctive relief to protect its business and
goodwill and to enforce the contract:

> The Employee acknowledges that compliance with these restrictions is
> necessary to protect the Employer's business and goodwill and that a

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 6

> breach shall irreparably and continually damage the Employer, for which
> money damages may not be adequate.  **Consequently, if the Employee
> breaches or threatens to breach any of these covenants, the Employer
> shall be entitled to a preliminary or permanent injunction to prevent
> the continuation of this harm and money damages.**  Money damages
> shall include the Employers right to recover fees, compensation, or other
> remuneration earned by the Employee as a result of any breach.  Nothing in
> this Agreement shall be construed to prohibit the Employer from also
> pursuing any other remedy.

*(Id.* at Ex. 2 at § 4.5 (emphasis added).)

In addition to the covenants contained within the Employment Agreements,

Simpson signed a nondisclosure agreement ("NDA") with POET on November 11, 2006.

(Am. Verified Complaint ¶ 11, Ex. 3.)   Pursuant to the NDA, Simpson agreed not to

publish, disseminate, disclose, or use in any way POET's confidential information.  (*Id.*

¶11, Ex. 3 at § 2.2.)

### 2.      Simpson's Departure and Employment with Ethanex

On Monday July 16, 2007, Simpson submitted a written letter of resignation from

his position with POET.  (Am. Verified Complaint ¶ 14, Ex. 6.)  On July 19, POET

accepted Simpson's resignation effective that day.  (*Id.* ¶ 15, Ex. 7.)  At that time, Poet

reminded Simpson of his contractual obligations regarding confidentiality and non-

competition:

> I remind you that you are contractually obligated not to solicit any
> employees of Poet for the next two years; required to return immediately all
> Poet property and confidential information; prohibited from using or
> disclosing any confidential or proprietary information of Poet; and barred
> for a period of three years from working in the ethanol industry.  As you

probably know, Poet has been aggressive in enforcing its covenants not to compete and protecting the confidentiality of its information.

*(Id*.)

Despite his contractual obligations to POET, on July 23, 2007, one business day after Simpson had left POET, it was announced that he had been appointed Vice President of Operations for Ethanex.  (Am. Verified Complaint ¶ 16, Ex. 8.)  According to Ethanex's press release, Simpson "will be responsible for the overall operations of Ethanex Energy's planned ethanol production facilities."  (*Id.*)  "In addition, Mr. Simpson will lead the plant organizational structuring, environmental compliance and community relations."  (*Id*.)  This press release notes that as a result of his employment with POET, Simpson has significant experience in ethanol production and management:

> Mr. Simpson was employed by POET Plant Management for the past nine years as a General manager of plant operations.  Most recently he managed POET Biorefining – Caro (formerly Michigan Ethanol, LLC).  During his five year tenure Mr. Simpson was responsible for initial staffing and start-up as well as full operational and P&L responsibility.  Mr. Simpson's plant Organizational Structure became the standard for all subsequent Poet facilities.
>
> Prior to the Caro facility, Mr. Simpson was General Manager of Agra Resources Coop (EXOL), a POET Managed dry mill ethanol plant in Albert Lea, MN.  Mr. Simpson successfully expanded the plant's production capacity by nearly threefold and successfully operated the facility at over 150% of design capacity.

*(Id*).

As is further noted in the press release, Ethanex "is a renewable energy company whose mission is to be the lowest cost producer of renewable energy by employing

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 8

advanced technology in design, construction and operation of ethanol plants." (*Id.*)

Ethanex "is currently developing two ethanol production facilities located in the mid-

west, with a combined production capacity of approximately 264 million gallons of

ethanol per year." (*Id.*)

When POET served the Summons upon Simpson on July 26, it also delivered

correspondence to him. (Am. Verified Complaint ¶ 20, Ex. 9.) The letter set forth

Simpson's contractual obligations, advised him that his announced employment with

Ethanex was in violation of his covenant not to compete, and asked him to resign from

his employment with Ethanex. POET also sent correspondence to Ethanex informing it

of Simpson's contractual commitments and this litigation. (*Id.*) POET did not receive

any substantive response from Simpson or Ethanex until Simpson removed this action

and filed a motion to dismiss for lack of service on August 17. Since the removal,

POET has learned that Simpson began working for Ethanex on July 30, 2007.

## II.  THE *DATAPHASE* FACTORS WEIGH IN FAVOR
## OF POET's REQUESTED PRELIMINARY INJUNCTION.

When considering whether to grant a preliminary injunction, this Court considers

the four *Dataphase* factors: (1) the movant's probability of success on the merits; (2) the

threat of irreparable harm to the movant absent the injunction; (3) the balance of this

harm and any injury that the injunction would inflict on other parties; and (4) the public

interest. *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). As is

set forth in detail below, the *Dataphase* factors favor entry of a preliminary injunction

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 9

enjoining Simpson from working for Ethanex and from using or disclosing any of

POET's confidential information or trade secrets to Ethanex, pending final resolution of

this action.

## A.      POET Will Prevail on the Merits.

For the purposes of a preliminary injunction, "likelihood of success on the

merits" requires only that the "movant find support for its position in governing law."

*See, e.g.*, *Curtis 1000, Inc. v. Youngblade*, 878 F.Supp. 1224, 1250 (N.D. Iowa 1995).  In

the Amended Verified Complaint, POET has alleged a number of substantive causes of

action against Simpson.  In Count 1, POET alleges that Simpson has breached and

continues to breach the covenant not to compete in his Caro Employment Agreement by

working for Ethanex.  In Count 2, POET alleges that Simpson has breached and/or will

breach his NDA by using and disclosing POET's confidential information during the

course of his employment with Ethanex.  In Count 3, POET alleges that Simpson has

misappropriated and/or will misappropriate POET's trade secrets by disclosing and using

them in conjunction with his employment at Ethanex.   All of POET's claims are

supported by the governing law and the factual record.

### 1.      Simpson is violating his covenant not to compete.

Simpson is subject to a valid covenant not to compete.  Simpson signed a covenant

not to compete against POET both when he was first hired as the general manager of

POET's Albert Lea plant and when he transferred to be the General Manager of the Caro

facility.  (Am. Verified Complaint ¶ 9, Ex. 1 and ¶ 10, Ex. 2.)  In signing the Caro

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 10

Employment Agreement, which is the agreement in effect at the time of his resignation,

Simpson agreed that he would not "during the term of this Agreement and within a period

of three years after leaving the employment of Employer [POET], engage, directly or

indirectly, in the same or a similar business to that of the Employer within the United

States of America."  (*Id.* Ex. 2 at § 4.3.).  The Caro Employment Agreement is governed

by South Dakota law.  (*Id.*, ¶ 10, Ex. 2 at §7.)

   Covenants not to compete are enforceable under South Dakota law.   SDCL § 53-

9-11 provides:

> An employee may agree with an employer at the time of employment or at
> any time during his employment not to engage directly or indirectly in the
> same business or profession as that of his employer for any period not
> exceeding two years from the date of termination of the agreement and not
> to solicit existing customers of the employer within a specified county, first
> or second class municipality, or other specified area for a period not
> exceeding two years from the date of termination of the agreement, if the
> employer continues to carry on a like business.

Under South Dakota law, when an employee voluntarily quits his job, as Simpson did,

his non-compete clause is enforced as long as it meets the statutory requirements of

SDCL § 53-9-11.  *Central Monitoring Services, Inc. v. Zakinski*, 553 N.W. 2d 513, 519

(S.D. 1996).

   The covenant not to compete in the Caro Employment Agreement complies with

the statutory requirements of SDCL § 53-9-11, with the exception of the of the

covenant's  three-year duration, which is one year more than allowed by South Dakota

law.   The three-year period does not invalidate the entire covenant, however, for South

Dakota has adopted a partial enforcement doctrine, whereby an overly broad non-compete provision is modified to comply with statutory requirements. *Franklin v. Forever Venture, Inc.*, 696 N.W.2d, 545, 551 (S.D. 2005). Pursuant to this doctrine, the South Dakota Supreme Court has routinely modified non-competition agreements to conform with the statutory mandates. *St. Onge Livestock Co., Ltd. v. Curtis*, 650 N.W.2d 537, 540 (S.D. 2002) (court amended and modified terms of non-compete agreement to comport with statute); *Simpson v. C & R Supply, Inc.* 598 N.W.2d 914, 920 (S.D. 1999) (modifying noncompetition provision to comport with statute by reducing boundaries); *Ward v. Midcom, Inc.*, 575 N.W.2d 233, 238 (S.D. 1998) (modifying noncompetition agreement to make it enforceable in the county in which employer was located); *Loescher v. Policky*, 173 N.W.2d 50, 55 (S.D. 1969) (modifying noncompetition agreement to limit its operation to twenty-five mile radius of defendant's veterinary practice). In this case, POET seeks to enforce Simpson's non-compete agreement only for the statutory permitted period of two years. (Am. Verified Complaint ¶¶ 75 - 78.)

Simpson is in violation of his covenant not to compete. The modified covenant precludes Simpson from working in the same business as POET within the United States for a period of two years from the termination of his employment. POET is in the business of constructing and operating ethanol-production plants, and Ethanex is in the business of constructing and operating ethanol-production plants, (Am. Verified Complaint ¶¶ 2, 3 and 17, Ex. 8). Simpson operated ethanol plants for POET, and Simpson will operate ethanol plants for Ethanex, (*Id.* ¶ 18). Because Simpson is working

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 12

for an employer within the United States who is engaged in the same business as POET,

Simpson is violating his covenant not to compete.

POET has established that it is likely to prevail on its claim that Simpson's

covenant not to compete precludes him for working for Ethanex for a period of two

years. This factor therefore weighs in favor of POET's requested preliminary injunction.

**2.    Simpson will violate his contractual and statutory obligations to preserve and protect POET's confidential information and trade secrets if he works for Ethanex.**

   a.    Simpson has an obligation to protect and preserve POET's confidential information and trade secrets.

As discussed above, the Caro Employment Agreement prohibits Simpson from

disclosing confidential information learned while working for POET, and provides that

POET is entitled to injunctive relief against Simpson if he breaches or threatens to breach

this obligation, (Am. Verified Complaint Ex. 2 at §§ 4.2 and 4.5.)  Likewise, the NDA

signed by Simpson prohibits Simpson from publishing, disseminating, disclosing, or

using in any way POET's confidential information.  (*Id.* Ex. 3 at § 2.2.)[1]  The NDA

_____

[1]The NDA broadly defines "confidential information as "any and all information
disclosed by Broin [POET] to Recipient relating to is business or technology that Broin
[POET] designates as being confidential or which, under the circumstances surrounding
disclosure, should be treated as confidential, regardless of whether Broin [POET]
provides such information to Recipient in tangible and/or intangible form even if it is
retained in the tangible or intangible memory of Recipient.  Confidential Information
includes for example and without limitation: Broin's [POET's] confidential business or
technical information(s), such as financial information(s), data, marketing technique(s)
and material(s), business plan(s) and strategies, business operations (s) and system(s),
pricing policies, information concerning employee(s), customer(s), and/or vendor(s),
investor(s), intellectual property, trade secret(s), idea(s), concept(s), discoveries,

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 13

further provides that if Simpson breaches or threatens to breach the NDA, POET is

entitled to injunctive relief to restrain the breach or threatened breach.  (*Id.* Ex. 3 at §

7.8.)

In addition to having contractual obligations to protect POET's confidential

information, South Dakota law requires Simpson to protect POET's trade secrets under

its version of the Uniform Trade Secrets Act ("UTSA").  SDCL §§ 37-29-1 to 37-29-11.

The UTSA defines a trade secret as follows:

> Information, including a formula, pattern, compilation, program, device,
> method, technique, or process, that: derives independent economic value,
> actual or potential, from not being generally known to, and not being
> readily ascertainable by proper means by, other persons who can obtain
> economic value from its disclosure or use; and is the subject of efforts that
> are reasonable under the circumstances to maintain its secrecy.

SDCL § 37-29-1(4).  Under the UTSA, the owner of a trade secret may petition the court

for injunctive relief for actual or threatened misappropriation.  SDCL § 37-29-2.  The

UTSA defines "misappropriation" of a trade secret as follows:

> (I) Acquisition of a trade secret of another by a person who knows or has
> reason to know that the trade secret was acquired by improper means; or
> (ii) Disclosure or use of a trade secret of another without express or implied
> consent by a person who:
> (A) Used improper means to acquire knowledge of the trade secret; or
> (B) At the time of disclosure or use, knew or had reason to know that such
> knowledge of the trade secret was : (I) Derived from or through a person

---

invention(s), improvement(s), research, development(s), product(s), composition(s),
prototype(s), biological or physical material(s), manufacturing, and manufacturing
process(es), except for such information described in paragraph 4.0."

(*Id*. Ex. 3 at § 1.1.)

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 14

who had utilized improper means to acquire it; (II) Acquired under
circumstances giving rise to a duty to maintain its secrecy or limit its use; or
(III) Derived from or through a person who owed a duty to the person
seeking relief to maintain its secrecy or limit its use: or
(C) Before a material change of position, knew or had reason to know that
it was a trade secret and that knowledge of it had been acquired by accident
or mistake.

SDCL § 37-29-1(2).

        b.      <u>Simpson possesses POET's confidential information and trade
secrets.</u>

Simpson possesses substantial information that constitutes confidential

information pursuant to his Caro Employment Agreement and the NDA and trade secrets

as defined by the UTSA.   The confidential information and trade secrets known by

Simpson include, but are not limited to, the following areas:

**POET Production/Operations**
1. BPX – flow from beginning to DDG production;
2. Enzymes – particular enzymes used, blend rates, usage, activity;
3. Corn Grinding – flour fines, grinding systems, hammer mill developments;
4. Infection control;
5. High gravity fermentation;
6. Water balance;
7. Zero discharge;
8. Standard Operating Procedures;
9. Process drawings – red lines, as builts;
10. Temperature staging;
11. Yeast and ingredients – portions, timing, temperatures, pH levels;
12. Ring dryers – specific flow parameters and temperatures;
13. Heat/Mass balance between evaporators/distillation/sieves;
14. Overall energy conservation and usage;
15. Ethanol production and percentages achieved; and
16. Process controls (DCS) – programming, PI.

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 15

### POET Financial and Marketing Information

1. Profit and loss data, balance sheet information, income statements, cash flow information;
2. POET Board activity and strategies;
3. POET Ethanol Products – marketing strategies, sales data, customer lists;
4. POET Nutrition – marketing strategies, sales data, customer lists;
5. Yield and efficiency data;
6. Operations recap data – not only for Caro plant, but company wide because of attendance at quarterly review meetings;
7. Capital units transfer system, capital unit's value;
8. Internal projects – IRR, NPV, strategy;
9. Strategic Plans, scorecards, other internal performance measurement tools;
10. Banking covenants and loan agreements; and
11. Internal programs (PSM, EAP, Safety, EH&S, etc.).

### POET Risk Management Programs and Practices

1. Corn risk programs;
2. Specialty programs;
3. Natural gas risk programs; and
4. Corn procurement strategy – DTN, email, POET Risk internal correspondence.

### POET Research and Development

1. Exposure to internal documentation;
2. Liberty; and
3. Bell.

### POET Quality Control Protocols

1. Testing protocols;
2. Standards for ethanol and feed products;
3. Standard Operating Procedures; and
4. Process trials and research.

(Am. Verified Complaint ¶ 30.)  All of the above-listed information meets the definition of confidential information under the Caro Employment Agreement and the NDA and constitutes trade secrets under the UTSA.  POET derives economic value from this information because it is unknown to, and not readily ascertainable by, others in the

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 16

ethanol industry.  (*Id.* ¶ 31.)  Ethanol plants that are designed, constructed, and operated

by POET consistently achieve greater ethanol yields and higher profit margins than their

competition.  (*Id.*)  As a result, companies and their investors who want to build and own

an ethanol plant are willing to pay substantial sums of money to license POET's

technology, to hire POET to design and build the ethanol plant, and to manage the plant.

(*Id.*)  If POET's confidential information and trade secrets were to become known to

others in the industry, the value of POET's proprietary information would be lost.

POET has taken significant precautions to maintain the secrecy of its information.

(Am. Verified Complaint ¶ 32.)  When POET enters into a relationship with a new

ethanol facility, the facility is required to sign a confidentiality and nondisclosure

agreement.  (*Id.*)  The management agreement between the plant and POET also contains

confidentiality provisions.  (*Id.*)  Because of those confidentiality provisions, employees

working in POET ethanol plants sign confidentiality agreements and covenants not to

compete.  (*Id.*)  In addition, POET's consultants and vendors are required to sign

confidentiality and nondisclosure agreements.  (*Id.*)  Furthermore, POET plants,

including the Caro, Michigan facility where Simpson was last employed, can be accessed

by authorized visitors only through the main entrance.  (*Id.*)  Visitors are required to

check in with the receptionist and sign a visitor's book.  (*Id.*)  Visitors are then escorted

by a plant employee while in the building.  (*Id.*)  Moreover, POET maintains a secure

computer system.  (*Id.*)  Consequently, POET's confidential information meets the legal

and factual requirements for a trade secret under South Dakota law.

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 17

      c.      <u>POET is entitled to injunctive relief to protect its confidential
information and trade secrets.</u>

To be entitled to injunctive relief, POET does not need to establish actual
disclosure or use of its confidential information and trade secrets. In signing the Caro
Employment Agreement and the NDA, Simpson acknowledged and agreed that POET is
entitled to injunctive relief from actual or *threatened* disclosure of confidential
information. Similarly, the UTSA authorizes injunctive relief for actual or *threatened*
misappropriation of a trade secret. SDCL § 37-29-2. Simply put, to be entitled to
injunctive relief, POET need not show that Simpson has already improperly used or
disclosed POET's information; instead, POET need only show that Simpson's
employment with Ethanex represents a threat of disclosure or use of POET confidential
information and trade secrets.

Simpson cannot work for Ethanex as its Vice President of Operations without using
and disclosing confidential information and trades secrets learned during his nine years of
employment with POET. All of his expertise and knowledge regarding ethanol production
and ethanol plant management was acquired during his tenure at POET. Simpson cannot
possibly oversee the operations of multiple ethanol plants without using and disclosing
confidential information acquired from POET. Ethanex's own press release indicates that
Simpson acquired and implemented valuable knowledge while employed by POET.
Because Simpson's employment with Ethanex represents a real and substantial threat of
disclosure and use of POET's confidential information and trade secrets, POET is entitled

to an injunction enjoining Simpson from working for Ethanex or otherwise disclosing or using POET's confidential information and trade secrets.

An employee who possesses a company's sensitive information is properly enjoined from working for a direct competitor when he will inevitably draw upon and use his previous employer's confidential information.  For example, in *PepsiCo, Inc. v. Redmond*, the Seventh Circuit followed the inevitable disclosure doctrine and held that a managerial employee of a soft drink manufacturer would inevitably disclose trade secrets to a competitor if he accepted employment with that competitor.  54 F.3d 1262, 1271 (7th Cir. 1995).   As the court noted, "PepsiCo finds itself in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game."  *Id.* at 1270.  The court concluded that even without an actual showing that Redmond would use PepsiCo's trade secrets in his new position with a direct competitor, the fact that Redmond possessed high-level confidential information regarding PepsiCo's marketing and financial plans for its products would make it impossible for him to compartmentalize that knowledge and not incorporate it into his job with PepsiCo's competitor.  *Id.* at 1269. Because the Seventh Circuit found that Redmond would inevitably disclose trade secrets to PepsiCo's competitor if he were allowed to accept an employment offer with that competitor, the court upheld the trial court's issuance of injunctive relief precluding Redmond from going to work for the competitor.  *Id.* at 1272.

The facts in this case are similar to those in *PepsiCo*, in that Simpson possesses significant confidential information about POET's unique ethanol-production technology;

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 19

its production techniques, practices, and results; its risk management and procurement

programs and strategies; its past and current research and development; its marketing

strategies and data; and its financial performance.  Simpson is now going to work for a new

employer who is in the same business as POET and will be performing the same basic

functions that he performed while at POET.  Simpson's position with Ethanex is a

managerial position where he will be involved in all levels of Ethanex's operation of its

ethanol plants.  Because all of Simpson's knowledge regarding operating ethanol plants was

gained solely through his employment at POET, he cannot perform his job at Ethanex

without inevitably relying upon, using, and disclosing confidential information he received

from POET.  Therefore, as was the case in *PepsiCo*, POET is entitled to injunctive relief

prohibiting its former employee from working for a competitor.

   In determining whether to grant preliminary injunctive relief in cases like this one,

courts in other jurisdictions have also examined whether the employee will likely disclose

his former employer's trade secrets.  *See*, *Dexxan Digital Storage, Inc. v. Haenszel*, 832

N.E.2d 62, 68-69 (Ohio App. 2005) (Injunctive relief granted based upon inevitable

disclosure of trade secrets.); *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 274

(Ohio 2000) (Injunctive relief granted based upon inevitable disclosure of trade secrets.);

*Cardinal Freight Carriers, Inc. v.  J.B. Hunt Transport Services, Inc.*, 987 S.W.2d 642, 646

(Ark. 1999) (Injunctive relief granted because of inevitable disclosure of trade secrets);

*National Starch & Chemical Corp. v. Parker Chemical Corp*. 530 A.2d 31, 33

(N.J. 1987) (Injunctive relief upheld because of inevitable disclosure of chemical trade secrets.).

POET has shown that it will likely prevail on its claim that Simpson possesses confidential information and trade secrets of POET; that he has contractual and statutory obligations to not disclose or use this information; and that Simpson cannot perform his work at Ethanex without using or disclosing POET's protected information. This factor again weighs in favor of granting the requested injunction.

**B.    If the Injunction is not Granted, POET Will Likely Incur Irreparable Injury.**

In this case, an injunction precluding Simpson from working for Ethanex should be granted to protect POET's immediate interests.   When Simpson signed the Caro Employment Agreement, he specifically acknowledged and agreed that a breach of the covenant not to compete would irreparably and continually damage POET, and that if he breached or threatened to breach the covenant, POET was entitled to injunctive relief to prevent the continuation of the harm.  (Am. Verified Complaint. Ex. 2, § 4.3.)  Because Simpson has agreed that a breach of the covenant not to compete would irreparably damage POET and that POET is entitled to injunctive relief to prevent such harm, POET need not make an actual showing of irreparable harm.  *See Curtis 1000*, 878 F.Supp. at 1250. (noting that there is legal authority for entering injunctive relief based upon a party's contractual stipulation that breach of an agreement entitles the other party to an injunction).

In addition to Simpson's contractual concessions, the record demonstrates that if he is allowed to work for Ethanex, POET will in fact suffer irreparable harm.  The ethanol

industry is highly competitive and growing rapidly, as is evidenced by the development of new start-up companies such as Ethanex, which plans to have two new facilities with a combined annual production of more than a quarter of a million gallons of ethanol. (Am. Verified Complaint ¶ 21.) POET, which was originally founded in 1987, is a pioneer and leader in the ethanol industry. (*Id.* ¶ 22.) POET and the plants that employ POET technology, techniques, and management practices consistently outperform their competitors in production, performance, and profit margins. (*Id.*) Through its extensive research and development, cutting-edge technology, and unique organizational structure and management practices, POET has developed a business model that is the standard to which its competitors strive to meet. ((*Id.*) POET employees are some of the most skilled and knowledgeable in the industry, and their POET experience is highly sought after by the ethanol industry. (*Id.* ¶ 23.) POET's technology and management techniques constitute confidential information and trade secrets, and POET does not want Ethanex or others in the ethanol industry to learn the details of its technology, production processes, and operational methods. (*Id.* ¶ 24.) It is for those reasons that POET and its plants require employees to sign non-compete and nondisclosure agreements. (*Id.* ¶ 25.)

Simpson possesses confidential information and trade secrets that POET does not want revealed to Ethanex and other competitors. (Am. Verified Complaint ¶ 26.) Simpson has worked for POET as a General Manager for nine years and in that time had access to and has obtained volumes of confidential information that POET employs to successfully design, construct, and manage a profitable ethanol plant. (*Id.* ¶ 27.) As a General Manager,

Simpson had access to POET's unique technology; its production and operational information and techniques; its risk management programs and practices; its on-going, state-of-the-art research and development; its quality control protocols and standards; and its strategic, business, and financial information. (*Id.*)

Simpson not only had access to information related to the plants that he directly managed, but through meetings, telephone conferences, training, and internal company communications, Simpson had access to the operational data for other plants in the organization. (Am. Verified Complaint ¶ 28.) Simpson was involved in regular teleconference meetings with other POET general managers and corporate officers, where highly-sensitive information was shared regarding other POET plants and long-term company planning. (*Id.*)

In sum, Simpson possesses the confidential information and trade secrets used by POET to consistently produce the industry's highest percentages of ethanol and to operate the most profitable plants in the industry. (*Id.* ¶ 29.) As discussed above, if Simpson is permitted to work for Ethanex, he will inevitably use and disclose POET's confidential information and trade secrets. Simpson is taking nine years of POET knowledge, including highly-confidential technology, information, and data, and is essentially handing it over to a competitor who has a stated desire to become a technological leader in the ethanol industry. If Simpson is allowed to use or disclose POET's confidential information to Ethanex, POET will suffer irreparable harm to its business, and the confidentiality of its proprietary information and trade secrets will be forever lost.

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 23

Because POET faces a real and significant threat of irreparable harm if Simpson is allowed to work for Ethanex as head of its operations, this factor weighs in favor of a preliminary injunction.

**C.      Simpson Will not be Substantially Harmed if the Injunction is Issued.**

While POET will be irreparably harmed if Simpson is allowed to use and disclose POET's confidential information and trade secrets, Simpson will not suffer any irreparable harm if the injunction is issued.  POET is simply asking this Court to issue a preliminary injunction enforcing Simpson's covenant not to compete and his confidentiality obligations until this matter is finally resolved.  When he signed his Caro Employment Agreement and accepted the financial benefits of the contact, Simpson agreed that when he left the employ of POET, he would not work for an employer in the same business as POET.  Simpson further agreed that if he did accept employment in violation of his covenant not to compete, POET was entitled to preliminary injunctive relief enjoining him from doing so.  If the Court ultimately determines that Simpson's covenant not to compete does not prevent him from working for Ethanex, his only potential injury is a temporary a loss of wages. Although POET suspects that Ethanex will continue to pay Simpson even if the injunction is entered, POET is willing to deposit appropriate security with the Court to cover any potential legal damages Simpson may incur as a result of the injunction.   Because the potential harm to POET is substantial and irreparable, and any potential harm to Simpson is relatively minimal and easily remedied with an award of damages, this factor weighs in favor of the injunction.

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 24

**D.    The Public's Interest Favors Enforcing Simpson's Contractual Obligations.**

Issuance of the preliminary injunction is in the public interest.  Through the
enactment of SDCL § 53-9-11, the South Dakota legislature has recognized the validity and
enforceability of covenants not to compete signed between employers and employees.  As
noted above, the South Dakota Supreme Court has regularly enforced covenants not to
compete, even when they are overly broad by conforming them to comply with statutory
mandates.  POET wishes to enforce the covenant not to compete only to the extent
authorized by South Dakota statute.  Public policy favors requiring a party to abide by his
contractual obligations.  Public policy also favors the preservation of valuable confidential
information and trade secrets.  In this case, Simpson agreed that when he left the employ of
POET, he would not go to work for an employer in the same business as POET.
Nonetheless, Simpson has accepted employment that clearly violates his contractual
obligations and places him in a position where he will inevitably use and disclose POET's
proprietary information.  The public has an interest in seeing that Simpson is required to
abide by his contractual commitments pending resolution of this matter.   Like the previous
factors, this factor weighs in favor of the requested injunction.

## III.  CONCLUSION

Prior to working for POET, Simpson had no experience or knowledge related to
ethanol production.  During the course of the last nine years, Simpson has gained invaluable
information from POET.   As part of his Employment Agreements with POET, Simpson
agreed not to disclose confidential information to third parties.  He also agreed not to go to

work for direct competitors in the ethanol industry.  Despite his contractual obligations, the ink had barely dried on his resignation letter before it was announced that he was joining the upper management of a direct competitor in this fiercely competitive industry.  Simpson's actions are in direct violation of his Employment Agreement, his NDA, and South Dakota law.  His employment with Ethanex represents a serious threat of immediate and irreparable harm to POET.

Accordingly, POET respectfully asks this Court to grant its request for a TRO enjoining Simpson from working for Ethanex and from disclosing or using any of POET's confidential information and trade secrets.  POET also asks that the Court allow POET to conduct its requested expedited discovery.  POET further asks the Court to schedule a hearing on POET's application for a preliminary injunction while the requested TRO is still in place and that following the hearing the Court enter a preliminary injunction prohibiting Simpson from working for Ethanex and from disclosing or using any of POET's confidential information and trade secrets.

Dated this 23rd day of August, 2007.

WOODS, FULLER, SHULTZ & SMITH P.C.

By   /s/ Tim R. Shattuck
     Tim R. Shattuck
     Matthew P. Bock
     Cheri S. Raymond
     300 South Phillips Avenue, Suite 300
     Post Office Box 5027
     Sioux Falls, South Dakota 57117
     (605) 336-3890
     Attorneys for Plaintiffs

Case Number: CIV. 07-4116
Name of Document: Brief in Support of Motion for Preliminary Injunction
Page 26

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 23rd day of August, 2007, I electronically

filed the foregoing Brief in Support of Motion For Preliminary Injunction and Request For

Expedited Hearing with the Clerk of Court using the CM/ECF system which will

automatically send e-mail notification of such filing to the following:

      Mr. John Mullen
      Bangs, McCullen, Butler, Foye & Simmons
      100 North Phillips Avenue
      Sioux Falls, SD 57104

      Attorneys for Defendant

                              /s/ Tim R. Shattuck

                              One of the Attorneys for Plaintiffs